UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Case No. 05-CR-20007 |
| ) | |
| **JASPER VARGAS,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION**

This case is before the court for ruling on Defendant's Second Amended Motion to Quash Arrest and Suppress Evidence Illegally Seized (#20). Following this court's careful consideration of the arguments of the parties and the transcript of the evidentiary hearing held in this case, Defendant's Motion (#20) is DENIED.

BACKGROUND

On February 3, 2005, Defendant, Jasper Vargas, was charged by indictment with the offense of knowingly possessing more than five kilograms of cocaine, a Schedule II controlled substance, with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii). Defendant is represented by retained counsel, David C. Thomas.

On March 21, 2005, Defendant filed a Motion to Quash Arrest and Suppress Evidence Illegally Seized (#12). In this Motion, Defendant set out the facts regarding the stop and subsequent search of his truck, which was pulling a trailer, on November 20, 2004. Defendant requested the entry of an order quashing Defendant's arrest and suppressing all evidence seized as "fruits" of that unlawful arrest. On May 3, 2005, Defendant filed an Amended Motion to Quash Arrest and Suppress Evidence Illegally Seized (#14). This Motion appeared identical to the first one filed.

On May 26, 2005, the Government filed its Response to Defendant's Amended Motion to

Quash Arrest and Suppress Evidence (#16). In its Response, the Government set out detailed facts regarding the stop of the tractor-trailer that Defendant was driving and the subsequent search. The Government argued that Defendant's Motion should be denied because: (1) the police had probable cause to conduct a warrantless search of the tractor-trailer, based upon information obtained from an informant; (2) the police were authorized to conduct the search based upon Defendant's consent; and (3) the police possessed reasonable suspicion to detain the tractor-trailer pending the arrival of the canine unit and the results of the dog-sniff provided probable cause authorizing the search of the trailer.

On July 18, 2005, Defendant filed a Second Amended Motion to Quash Arrest and Suppress Evidence Illegally Seized (#20). In this Motion, Defendant set out more detailed facts regarding the three searches which occurred over the course of many hours after Defendant was stopped on November 20, 2004.

On September 26, 2005, an evidentiary hearing was held regarding Defendant's Second Amended Motion to Quash Arrest and Suppress Evidence Illegally Seized (#20). Prior to the hearing, this court concluded that Defendant's two earlier Motions to Suppress (#12, #14) were moot. The Government stated that it would stand on the Response (#16) it filed on May 26, 2005.

At the hearing, the Government presented the testimony of Trooper Robert Williams and Trooper Erik Shay, both of whom are employed by the Illinois State Police. Williams testified that he was working as a patrol officer on November 20, 2004. Williams received a "BOLO" around 11:05 a.m. He testified that a "BOLO" means "be on the lookout for." Williams testified that he received a description of a semitractor-trailer which was traveling northbound from Texas to Chicago. He also received information regarding the license plates on the tractor and trailer and the

driver's name. He was informed that the semitractor-trailer described was "loaded with a load of narcotics." Williams testified that the BOLO said "to make your own case, which means find your own probable cause to make the stop."

Williams testified that he subsequently saw a vehicle which matched the description he was given. He then pulled behind the vehicle to pace it. Williams testified that pacing is matching the speed of his vehicle with the speed of another vehicle, usually a vehicle in front of him. He stated that "[y]ou keep the same distance between you and that vehicle to determine the speed that that vehicle's traveling." Williams testified that pacing is typically done for a quarter of a mile or greater and that he determines the speed of his own vehicle by using the radar unit. Williams stated that the radar unit is calibrated daily to make sure it is accurate. He testified the radar unit was calibrated the morning of November 20, 2004, and was working properly.

Williams testified that he paced the semitractor-trailer for approximately a quarter of a mile and determined that the vehicle was traveling 64 miles per hour. The speed limit for semis was 55 miles per hour. Williams testified that he stopped the vehicle. Williams then began conducting a motor carrier safety inspection. Williams testified that he was required to conduct at least four of these inspections per month. Williams also approached Defendant, who was the driver of the vehicle. Williams testified that he told Defendant he had stopped him for speeding and that he was going to conduct an inspection. Williams collected documents from Defendant, including his driver's license. Williams testified that Defendant appeared somewhat nervous and "appeared to be a little shaky."

Williams testified that Defendant's paperwork showed that he was taking a load of produce from Mission, Texas, to Chicago. He asked Defendant to stay in his vehicle so he could check the

lights on the vehicle. Defendant got out of the vehicle on two occasions, and Williams had to tell him to get back into the vehicle so Defendant could show him the lights. Williams stated that the lights and signals were working properly. After Williams completed his inspection of Defendant's vehicle, he asked Defendant to get into his squad car. Williams asked Defendant about his female passenger, and Defendant informed Williams that he did not have authorization for her to be in the vehicle with him. Williams testified that Defendant appeared very nervous and his left leg continued to shake. Williams testified that he ran Defendant's driver's license through his computer and determined that Defendant had a valid Texas commercial driver's license and that Defendant had a criminal history for drug offenses. Defendant's driver's license showed that Defendant was 39 years old. Williams then completed his inspection forms, which showed that the vehicle passed the inspection, and issued a written warning for speeding and for unauthorized passenger. Williams testified that Trooper John Dittmer and Trooper Dave McWilliams had arrived at the scene at some point during the inspection. Their squad cars were located behind Williams' squad car.

Williams testified that he then asked Defendant if he had any type of narcotics. Williams next asked Defendant if he would give permission to search the vehicle. Williams testified that Defendant said "yes." Williams testified that, at that time, Defendant had not been handcuffed and none of the officers present had a gun drawn. Williams testified that Defendant "advised that he had a family member that was a police officer in Texas and that he knew we were just doing our job and that he had nothing to hide" and "didn't care that we searched the vehicle."

Williams testified that he and Dittmer began walking around the vehicle. Dittmer noticed a place on the front of the trailer below the refrigeration unit where it looked like there had been some rivets replaced. There were some rivets missing and it looked like there was fresh caulk on

the front of the unit. Williams testified that, at that point, they requested dispatch to notify a canine unit to come to the scene. Williams testified that Trooper Shay arrived with his dog and notified him that the dog had alerted to the presence of narcotics.

Williams testified that, after the dog alerted, he and Dittmer attempted to enter the trailer to see if they could see anything themselves. However, the trailer was full of produce packed in ice and it was difficult to get up into it. Williams testified that Trooper Banach subsequently arrived at the scene and took control of the scene.

Williams testified on cross-examination that he "paced" Defendant's vehicle for approximately two-tenths of a mile or less than 12 seconds. Williams also testified during cross-examination that, at the time he asked Defendant for permission to search the vehicle, Defendant was not free to leave because Williams still had Defendant's paperwork. Williams further testified that he did not tell Defendant that he was free to go or that he had a right to refuse consent. Williams also testified that his report showed that he received the "BOLO" at 11:05 a.m. and stopped Defendant's vehicle at 11:50 a.m. He stated that he called for the canine unit at around 1:10 p.m. The canine unit arrived on the scene at approximately 1:30 p.m. At approximately 2:45 p.m., Defendant was told to drive his vehicle to the headquarters of the Illinois Department of Transportation at Ashkum, Illinois.

Trooper Erik Shay testified that he is a canine officer with the Illinois State Police. He testified regarding the training he and his dog, Boston, have received. He testified that his dog successfully passed every area of an evaluation conducted in May 2004. Shay testified that his dog also passed an evaluation conducted on November 17 through November 19, 2004. In that evaluation, the dog failed the three-minute stay test but passed every other test.

Shay testified that he received the call regarding the stop at issue in this case on November 20, 2004. He arrived at the scene with his dog, and took the dog around the entire vehicle. Shay testified that his dog demonstrated a positive alert for the presence of narcotics on the passenger side of the vehicle in the sleeper berth area, on the back side of the sleeper berth, and on a rubber hose hanging from the refrigerator unit of the trailer. Shay testified that he advised Williams and the other troopers at the scene of the alert.

Following this testimony, the Government rested. Defendant then testified in support of his Motion to Suppress. Defendant stated that he was not speeding when he was pulled over by Williams. He testified that he had the cruise control on the semitractor-trailer set on 54 miles per hour. Defendant also testified that, when Williams asked him for permission to search the vehicle, Williams had all of his paperwork. Defendant stated that he did not know he could refuse to consent. On cross-examination, Defendant stated that he had recently had the speedometer in his vehicle calibrated and that he had his cruise control set on 54 miles per hour from the time he entered Illinois. Defendant also stated that, at the time he consented to Williams' request for permission to search, the other troopers were in their squad cars. Defendant testified that he never told the officers to stop searching the truck.

Following the hearing, Defendant filed his Proposed Findings of Fact, Conclusions of Law, and Memorandum of Law (#25). On November 18, 2005, the Government filed its Proposed Finding of Fact, Conclusions of Law, and Memorandum of Law (#26). Defendant filed his Reply (#30) on January 17, 2006.

## ANALYSIS

Defendant argues that the cocaine ultimately recovered from the refrigeration unit of the trailer must be suppressed because: (1) Defendant was seized without probable cause; (2) the permission Defendant gave for the search was not knowing and voluntary; and (3) the search went far beyond the scope of the purported consent, in terms of the number of searches and their intrusive nature. This court will address each of Defendant's arguments.

This court initially notes that, after observing the manner and demeanor of the witnesses who testified at the evidentiary hearing held on September 26, 2005, it found both Williams and Shay to be credible witnesses. This court further found that the testimony of Defendant was not credible.

## I. STOP

Defendant first argues that there was no probable cause for the stop of his vehicle. In response, the Government contends that Williams had probable cause to stop Defendant and the tractor-trailer he was driving because Defendant was speeding. In his Reply, Defendant argues that the evidence shows that Defendant was not speeding and Williams created "a fictitious speeding charge" in order to stop the vehicle described in the BOLO.

This court concludes that Williams provided credible testimony that he "paced" Defendant's vehicle and determined that Defendant was traveling 64 miles per hour when the speed limit for his vehicle was 55 miles per hour. This court further concludes that Defendant's testimony that he had the cruise control set at 54 miles per hour from the time he entered Illinois was not credible or worthy of belief. Accordingly, this court concludes that Williams had probable cause to stop Defendant's vehicle. There is no question that speeding is an offense under Illinois law and one for which troopers are authorized to make vehicle stops. See 625 Ill. Comp. Stat. 5/11-601 (West 2004); United States v. Willis, 61 F.3d 526, 530 (7th Cir. 1995).

II.  CONSENT

Defendant next contends that the permission to search the vehicle obtained from Defendant was not constitutionally valid because Defendant was not told that he had a right to refuse and because Defendant was not free or able to leave.  In response, the Government argues that the totality of the circumstances demonstrates that Defendant voluntarily provided consent to search.  This court agrees with the Government.

Consensual searches are acceptable under the Fourth Amendment because it is reasonable for law enforcement officers to conduct a search once they have been permitted to do so.  See United States v. Maldonado, 38 F.3d 936, 940 (7th Cir. 1994).  A voluntary consent "lifts" the warrant requirement.  See United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996), quoting United States v. Quinones-Sandoval, 943 F.2d 771, 774 (7th Cir. 1991).  The Government bears the burden of proving by a preponderance of the evidence that consent was given freely and voluntarily.  United States v. Villegas, 388 F.3d 317, 325 (7th Cir. 2004); see also United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).  Whether the consent is voluntary is determined from "the totality of all the circumstances."  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).  In assessing the totality of the circumstances, the court considers relevant factors such as: (1) the person's age, education, and intelligence; (2) whether he was advised of his constitutional rights; (3) how long he was detained prior to the consent; (4) whether the consent was immediate, or was prompted by repeated requests; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent.  See Villegas, 388 F.3d at 325; United States v. Raibley, 243 F.3d 1069, 1075-76 (7th Cir. 2001). Other factors include the nature of the police questioning, the environment where the questioning took place, the possibly vulnerable state of the person consenting, and the

consenting party's knowledge of the right to refuse consent.  See United States v. Nafzger, 965 F.2d 213, 216 (7th Cir. 1992), citing Schneckloth, 412 U.S. at 227, 229, 247.  Police actions that have troubled the Seventh Circuit include situations where officers enter the premises with guns drawn, display abusive demeanor, lie to the defendant, or threaten to conduct a search with or without consent.  United States v. Talkington, 843 F.2d 1041, 1048-49 (7th Cir. 1988); see also United States v. LaGrone, 43 F.3d 332, 334-35 (7th Cir. 1994).

A determination of voluntariness does not ride on the presence or absence of a single controlling factor: the court must make a "careful scrutiny of all the surrounding circumstances."  Schneckloth, 412 U.S. at 226.  Accordingly, the failure to tell the defendant that he may withhold consent, though a consideration, does not render the consent involuntary.  See United States v. Price, 54 F.3d 342, 347 (7th Cir. 1995), citing Schneckloth, 412 U.S. at 234.

Defendant argues at length that his consent cannot be considered voluntary because he was not free to leave when Williams asked him for consent to search his vehicle.  Defendant notes that the evidence presented at the hearing showed that, at the time consent was requested, Defendant was in Williams' squad car and Williams had all of his paperwork.  Defendant contends that he was completely under the control of the officers and "couldn't leave without the officers' permission, so he reasonably believed that he had no choice but to consent."  Defendant also notes that it is undisputed that Williams did not tell him he had the right to refuse consent.

This court agrees with the Government's argument, however, that similar circumstances were present in the case of Quinones-Sandoval.  In that case, also, the defendant was stopped for a traffic violation and was sitting in the patrol car when he was asked for permission to search his car.  Quinones-Sandoval, 943 F.3d at 775.  The Seventh Circuit noted that "it was unlikely that Quinones

believed he was free to go–nor was he ever told he could leave prior to volunteering that the car could be searched." Quinones-Sandoval, 943 F.3d at 775. The Seventh Circuit concluded "[t]hat feeling of constraint, however, does not inevitably lead to the conclusion he could not voluntarily consent to a search," noting that "the sole fact that Quinones was seated in the patrol car does not by itself distinguish his circumstances from that of any other motorist who has been pulled over for a minor traffic violation." Quinones-Sandoval, 943 F.3d at 775.

This court concludes, after considering the totality of the circumstances in this case, that the Government has met its burden to show that Defendant's consent was knowing and voluntary. The facts show that Defendant was 39 years old at the time of the stop and demonstrated at the evidentiary hearing that he can understand and respond to questions. Defendant testified that he has had several prior encounters with law enforcement and had his vehicle searched on a previous occasion. The evidence further showed that none of the troopers displayed or brandished their guns and Defendant was not physically restrained. Defendant consented immediately when Williams asked for permission to search his vehicle, and not after repeated requests. In fact, Williams testified that Defendant stated that he knew the officers were just doing their jobs and he "didn't care that we searched the vehicle." This court finds this testimony credible and extremely probative on the issue of whether Defendant's consent was voluntary. This court further concludes that the length of time between the time of the stop and the time consent was requested was not unreasonable considering that Williams conducted a motor carrier safety inspection, reviewed Defendant's paperwork and wrote a written warning during that time. See United States v. Martin, 422 F.3d 597, 602 (7th Cir. 2005), cert. denied, ___ U.S. ___, 2006 WL 152078 (Jan. 23, 2006) (lengthier stop justified by the circumstances of the case). For all of these reasons, this court agrees with the Government that the

circumstances present in this case lead to the conclusion that Defendant's consent to search his tractor-trailer was not coerced but rather was freely and voluntarily given.

### III. SCOPE OF SEARCH

Defendant finally argues that, even if consent to search was given knowingly and voluntarily, he did not authorize the three searches conducted in this case. Defendant states that, after Trooper Banach arrived at the scene, the troopers searched the tractor and trailer for about an hour and nothing was found. After Defendant was instructed to drive the vehicle to Ashkum, the troopers again searched the tractor and trailer. During this search, the cover to the refrigeration unit was removed. Again, nothing was found. At approximately 6:30 p.m., Defendant was instructed to drive the vehicle to Monee. At this location, the produce was unloaded and another search was conducted. It was only after additional pieces of sheet metal were removed from the refrigeration unit that Trooper Banach recovered a quantity of cocaine from the refrigeration unit. According to Defendant, this occurred at approximately 9:30 p.m. Defendant contends that the searches were improper because he was never asked to consent to the second and third searches and because he was never told the object of the search and a reasonable person would not think he was consenting to the highly intrusive searches involved here, which entailed the dismantling and destruction of portions of the trailer.

In response, the Government stated that, while it does not disagree for the most part with the facts set out by Defendant, it does not believe that any testimony was presented regarding these facts at the evidentiary hearing. The Government also argues that, rather than three searches, there was one continuous search for drugs that was undertaken at different locations due to the exigencies of the situation. The Government contends that the officers had probable cause to conduct the search

11

of the vehicle based upon the positive reaction from the dog for the presence of drugs.

This court agrees with the Government that Defendant did not present evidence regarding the search conducted at Ashkum and Monee, although he was given the opportunity to present any evidence he wished at the evidentiary hearing. However, in any event, this court agrees with the Government that the search of the vehicle was proper and reasonable because it was based upon probable cause. Williams testified that, after Defendant consented to a search of the vehicle, Dittmer noticed missing and replaced rivets and fresh caulk on the refrigerator unit. Once these suspicious circumstances were discovered, Williams reasonably requested a canine unit. See Martin, 422 F.3d at 602. Once the drug dog alerted to the presence of drugs, the officers had probable cause to search the vehicle. See Martin, 422 F.3d at 602; United States v. Rogers, 387 F.3d 925, 934 n.9 (7th Cir. 2004).

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Second Amended Motion to Quash Arrest and Suppress Evidence Illegally Seized (#20) is DENIED.

(2) Because this court has ruled on the pending motion to suppress, this court converts the status conference scheduled for February 10, 2006, at 1:30 p.m. to a telephone status conference.

ENTERED this 2nd day of February, 2006

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE